23-4074. Counsel for appellant, if you would make your appearance and please proceed. Good morning, your honors. May it please the court, Benjamin Waxman of the Miami law firm Black & Shrednick, together with co-counsel Howard Shrednick sitting at council table and Ed Armolino and Alexa Klein sitting directly behind him for the appellant, Mr. Dermen. The district court abused its discretion in failing to grant a new trial based on juror misconduct, including and emerging from the posting of their verdicts ignited the nation on the jury room door. One misdeed after another exacerbated the extreme prejudice to Mr. Dermen. During jury selection, Juror 3 brought a People magazine into the jury room. That was in late January 2020. Some two to three weeks into trial, Juror 5 paged through the magazine, fixated on the burning chair ad and posted it on the jury room door. This disturbing ad highlighted the incendiary national consequences of finding a defendant not guilty in a notable case that might be questioned by the public. A courtroom clerk saw the posted ad, took it down, and then reposted it more firmly with scotch tape. The posted ad now had the imprimatur of the court on it. Around the same time in mid-February, Juror 16 heard a juror state in a group that Mr. Garagos, Dermen's counsel, represented Michael Jackson in the trial and also heard a group of jurors. On February 24th, Juror 6 researched the four cases on the ad, including the Michael Jackson case, the O.J. Simpson case, and the George Zimmerman case on her phone in direct violation of two specific orders that the court gave during jury selection. One was prohibiting the jurors from doing any research related to the case, and the second was prohibiting them from using any kind of electronic devices while serving as jurors. On the same day, Security Officer Heritage heard Jurors 3 and 6 state in a group of about eight jurors, he's the one who got Michael Jackson off. Juror 7 then added to the investigation. Juror 3 then added that Michael Jackson was found not guilty and that doves were released from the courtroom steps for each not guilty verdict, and that her husband would have liked to have shot all the doves. And that's a nice place for me to segue in, counsel. It seems to me that this parade of marvels, we can take them as they will, but the reality is the district court did a thorough hearing to assess whether what the facts were here, and in the dove situation, it turns out that the juror's husband is a hunter. And I mean, and so the implication that somehow or other he wanted to shoot the doves because he was angry about Michael Jackson, there seems to be no validation to that. And go ahead, please. Sorry. One of the jurors specifically said that they understood Juror 3's remarks to reflect her disapproval with the Michael Jackson verdict. Did the jury, did the court not interview every juror to try to discern whether there was prejudice? The court did, and I intend to go through point by point how the jury's findings are simply unreasonable on this record that's before, that was before that court and unsupported by the facts. And is it, is it, is our, is the standard unreasonable or clearly erroneous? And if it's clearly, well, that's a distinction with the difference. If it is clearly erroneous, if there's any foundation in the record for it, we're supposed to validate it. Please, go ahead. Let me show you how these findings were clearly erroneous. So first, the judge said that there was absolutely no basis to excuse Juror 6 and that she was, quote, forthright and truthful. But Juror 6 clearly violated the two orders regarding not researching anything having to do with the case and not using any kind of electronic technology. Yet the court found in its order that there was no basis to excuse her. Juror 6 failed to come to the judge and report as the, as the instructions required that she had done this research. Let me interrupt for a second. Jurors talk all the time. When I've been sitting as a district judge, I know they talk all the time. But the question isn't whether they can talk and say, hi, good morning, was there a good game last night on TV? It's whether they talk about the case and try to decide the case. So what conversations were shown to have been related to the merits of this case? Well, very specifically, the statements regarding Mr. Garagos having represented Michael Jackson, true or false. No, no, that is not about this case. That is about a lawyer's background. My question is, was there any conversation about the merits of this case? And I didn't see any. There was no record of specific conversations that the jury was, for instance, deliberating. And we do not prohibit jurors to talk. I mean, I don't think there's anything wrong with a juror saying, boy, that lawyer has got a good suit on today, or that lawyer sure had troubles with his words getting them out, or something like that. I don't think that's an extraordinary thing for jurors to say. But the problem is, is that here, the jurors had discussions about Derman's counsel representing Michael Jackson in a sexual molestation case where their verdicts ignited the nation, suggested that his tactics or his representation in that case were widely disapproved by the nation and the public. And this was at a time when this jury was about to deliberate the guilt or innocence of Mr. Derman, who was represented by Garagos, who had previously engaged in this representation of Michael Jackson that was widely disapproved. So any juror that was there and aware of this would naturally be thinking, this is precisely that kind of a case where I may become the target of this widespread disapproval. Go ahead. Was there discussions among the jurors about that statement you just hypothesized? No. Well, there were. There were discussions to the extent that, again, Juror 3 said her husband would have shot all the doves. Well, I think that's a different story. But go ahead with your presentation. So the district court, again, turning to the district court's findings, said that the ad was akin to, was like a decoration, or that it was no different than a landscape painting or a cartoon. Well, you've seen the ad. It's simply not akin to a landscape painting or a cartoon. Instead, again, it highlighted the incendiary national consequences of finding a defendant not guilty in a high-profile case where that verdict might be disapproved by the public. Juror 5 certainly saw a connection. He said this, meaning the jury deliberations, was evocative of what was in the ad. Juror 5 stated that this was the room where the jury speaks and that the image of the burning chair, it's a rather disturbing image, represents the jury's identity. Juror 16 also saw the connection and said it's like the jurors in the hot seat. If you are the judge of somebody, it puts you in the hot seat. So these jurors were privately interviewed by the judge and assured the judge they could be fair. Isn't that correct? That is correct. Go ahead, please. No, no, and this court has recognized, and for instance, the U.S. Supreme Court Justices Brennan and O'Connor have recognized that jurors are reluctant to expose any bias that they have to a court. And, in fact, in this court's decision in Chathandra, I think, Judge Seymour, you might have been on that panel, the court recognized that jurors' assurances that prejudicial remarks of a trial judge would not affect deliberations even after detailed and prompt curative instructions are insufficient to overcome prejudice from extraneous information. It can be, but, I mean, in that situation, I find it very hard to compare that case to this case. You have a judge speaking, a judge talking about it being a smoke screen. You have an article in the paper that comes out later. I don't see anything near that here. I mean, what is illustrated by the colloquy you're having with Judge Ebel is that there are a list of things that happened, but then we have to draw the conclusions or make the inference that somehow or other it impacted anyone. As I understand it, the views that you were talking about, there's no evidence that anybody talked with anybody else about their views on these issues, right? Well, again, other than these conversations happened in a group in the presence of potentially eight or more jurors where they were, again, identifying Derman's counsel, the person who was making the arguments for him, who was examining the witnesses as the lawyer who represented Michael Jackson in a case that was on this posted ad. And if I'm a Michael Jackson fan, I think that's the coolest thing in the world, that you have a lawyer who represents Michael Jackson. I mean, there's no necessary inference of prejudice that comes from that. So what? He's a celebrity. I feel cool because I'm in a case involving a celebrity lawyer. What's the implication of that? The ad said that these juries' verdicts ignited the nation. Yes, and I recall reading quite a bit of the record. And I don't recall anybody, a lot of the people didn't even remember the ad. I mean, the ad was not something that they fixated on. Actually, I think the record reflects that all but one of the jurors recalled seeing the ad. Most of them required one or more of the listed cases on the ad. And many of them recalled the image of the burning chair. So the jurors were very much aware of this ad, were present during these discussions that associated, again, Dermon's counsel who represented him was making arguments and would be making arguments why they should not find Mr. Dermon guilty, that he was associated with this verdict that this ad suggested was disapproved widely by the nation. Let me cut you off for a quick second, please, just because I want to get to one point. You talked about Chitandra. And I would benefit from knowing why you think that case maps on to this case or why you think they're similar enough that it has persuasive force for you, particularly since we have to deal with the question of the curative instructions that the district court gave here, one, and two, the weight of the evidence that existed here. So with those things in the background, tell me why that case should mean anything to us. I agree with the court that the facts are very different from this. It's merely to demonstrate that this court has recognized that notwithstanding a juror's assurances that something did not prejudice them or impact their impartiality, that this court recognizes in some instances that may not be the case. The other case from this court is Gonzalez v. Thomas, the case about implied bias, which recognized the same thing. Implied bias may be found even though jurors deny impartiality. I apologize. Unless the court has other questions, I see that my time's just about out. I'd like to reserve some time for rebuttal. Thank you.  May it please the court. Alyssa Hart Mahan for the United States. I'd like to start by clearing up some factual matters here. First of all, there's no evidence in the record that Juror 6 violated the court's instructions, and the court so found in its thorough order denying the mistrial here. So Juror 6 did not know that there was any connection between the Michael Jackson case or any of the cases listed on the advertisement and the instant case. She testified that she had no idea that Mr. Geragos had ever represented Michael Jackson and was only looking up the cases out of curiosity. Second, the district court told the jurors not to use electronic devices while they were serving as jurors, but there was no ban on them using their phones when they were not sitting in court or deliberating. These jurors were waiting for transportation. They needed to be transported every day, and there was no violation of the court's order in Juror 6 using her phone. And let me ask, didn't the court's order relate to doing research as it relates to this case? Correct, correct. And the cases she was looking at were not this case, right? Correct, correct. She had no reason to believe that. The district court found that she was forthcoming, honest, and credible, and this court typically defers to those findings made by district judges. The district court here conducted extensive interviews of all of the jurors multiple times, so there is an extensive record, you know, transcript record to look at, but the district court made findings that the jurors did not view the advertisement as an inflammatory warning, specifically made those findings. And the interviews with the jurors support that finding. Several of the jurors said that they thought the advertisement was a joke of some sort. While some of them remembered some details, some of the jurors didn't remember that there were cases on the advertisement at all. And there's nothing in the record to suggest that the jurors connected the advertisement to this case, either the charges against defendant or even Mr. Geragos. There was evidence that, you know, the jurors were aware that he had had celebrity clients in the past, but the court found that that would not affect the jury's impartiality, and this court should defer to the district court's credibility findings, the district court who was able to interview these jurors multiple times and make those credibility findings after those in-person conversations. I'd like to address the Shatanzara case, and I think in that case this court presumed prejudice because there was extraneous information about the case at issue. The jurors were exposed to extraneous information about the case at issue. Jurors had seen a headline reporting that the district judge had criticized the defense's strategy, which was clearly related to the case before them. And both the Supreme Court and this court's precedents make clear that when there's extraneous information about the case, such as an attempt to bribe a juror or outside information about the defendant, a presumption of prejudice arises. Here, because the information at issue had no relation to this case, such a presumption should not arise. And in that case, the district court is entitled to make findings about whether the jurors are actually biased, whether there's any bias. The court here found no bias. The court issued detailed curative instructions. I would also note for the record that to the extent any of the jurors, and the court security officer for that matter, believed that Mr. Geragos represented Michael Jackson in his criminal trial, that belief was incorrect. Mr. Geragos did not represent Michael Jackson in his criminal trial, and the district court's curative instructions made that clear, stating that none of the counsel in the instant case were involved in any of the cases listed in the advertisement. Secondly, as I believe Chief Judge Holmes noted, in Chandas Hara, this court affirmed, despite presuming prejudice, because the overwhelming weight of the evidence fully supported the jury's verdict. And the same is true here. The district court found, in its omnibus order denying a new trial, that the overwhelming weight of credible evidence fully supported the jury's verdict. This was a lengthy trial. There was a lot of evidence. And the testimony of defendants' co-conspirators, Jacob and Isaiah Kingston, was fully corroborated by text messages, emails, bank records, and the testimony of other witnesses, some of whom were co-conspirators and some of whom were not. As the district court noted, if you follow the money, the defendant never came forward with any explanation for why he received over $70 million from the conspiracy. And so his efforts to discredit the testimony of his co-conspirators fell flat because of this overwhelming evidence of the defendant's guilt. If the court has any additional questions about any of the other issues? Oh, I do. Yes? Okay. Let's focus for a moment on the Brady claim.  And there was a statement in your brief, in the government's brief, that said that it was not aware of the Kazi Garcia lawsuit until it actually received the motion. And I'm just trying to get the timeline right as to understand, well, one, did the district court ever make any sort of findings about what the background would have been or in terms of understanding what the government would have been aware of and what the government wouldn't have been aware of in determining the question of sort of suppression? Yes, so the district court addressed, there were sort of two separate questions below. The first was whether the government had access to Kazi's cell phone because these messages with Santiago Garcia were on Kazi's cell phone. And the government had received screenshots of Kazi's cell phone from Kazi's lawyer. Those screenshots were forwarded to defense counsel. But the government never imaged Kazi's cell phone. It did not have access to its cell phone. Kazi was not a cooperator. He was a third-party witness. He testified before the grand jury, and he testified at trial subject to a subpoena. So he never entered into a cooperation agreement with the government. He wasn't a confidential informant. Did they have his cell phone? Did they take possession of his cell phone? No, they did not have possession of his cell phone. So they did screenshots from his cell phone? Kazi's attorney forwarded screenshots to the government, and those were turned over. And let me ask you, and this is also a question perhaps for defense counsel, but to your knowledge, was there any impediment in the defendant using subpoena power to get the phone records? Not to my knowledge. I mean, they had notice, and the government turned over all of Kazi's, I believe all of Kazi's grand jury testimony, all of the MOIs from Kazi's meetings with the government. So the defense had that information, and none of that referenced Garcia at all. So the first part, the district court found that the government did not suppress Kazi's cell phone because the government did not have that was in the possession of a third-party witness. The government did not have that evidence. And then the court's second finding, so Kazi's lawsuit alleges that either a law enforcement agent or someone impersonating a law enforcement agent assisted Garcia with the fraud. And so the defendant argued that that meant that the L.A. Best investigation, which was the state federal task force based in California, must have known about the transactions between Kazi and Garcia. And the district court's finding there was that even if an L.A. Best agent had been aware of these transactions, which we would submit there's no credible evidence that they were aware of those transactions, the L.A. Best task force was not part of the prosecution team in this case. Let's assume that that particular issue I have some doubts about, because we have case law that says that when you are working in a team on an investigation, every member of the team is presumed to have the information of every other member. So I'm not completely sure you're solid on that. But what was the findings by the court about what the L.A. Best people even knew? So if I remember correctly, I'm not sure that the court made a finding. She sort of said even assuming, because, again, the only allegation was that either an L.A. Best agent or someone impersonating an L.A. Best agent was involved. So she said even assuming there was an L.A. Best agent involved, she declined to impute that knowledge to the government. The court did make a finding that the L.A. Best was not a part of this prosecution team. Correct. The court found that they were separate teams, and that finding was made earlier on in the litigation pretrial. So is that finding that they weren't part of the organization, is that challenged here on appeal? I think to the extent, I think for this issue, I think the defense would argue that for this issue, if L.A. Best were aware. But I would also point out to the court that, you know, Santiago Garcia, I think the court can take judicial notice of this fact, has now been indicted on charges of wire fraud and impersonating a federal agent, which suggests that law enforcement was not involved in these fraudulent transactions between Garcia and Garcia. Is that connected to the record in this case, or was that separate? So it was based on the transactions between Kazi and Garcia. But all that happened after this case? Correct. He was indicted in January of 2024. I'm not sure we can reach that one and draw it back. I just, I don't know how closely these two groups really worked together. I know that in one of the briefs there was a long recitation of all the things that L.A. Best did to help the prosecutors here in Utah. You know, they said we were at depositions, we participated in depositions, we turned this record over, we did this, that, and the other thing. You remember that couple of pages where that long litany occurred. Yes. Why isn't that enough to show that they really were cooperative and working together? Well, the district court's order on that issue, finding that they were not part of the same prosecution team, found that there was no coordination. You know, there was some sharing of information after the fact, but there was no coordination. So like after interviews had occurred. Yeah, but not after the trial was over. No, no, no, not after the trial. But they weren't cooperating. They weren't cooperating in conducting joint interviews. They weren't coordinating their efforts. These were separate investigations. The prosecution team in this case had to get permission from the other team in order to get that evidence. But I would submit to the court that you don't need to reach this question regarding L.A. Best because the district court correctly found that this evidence was not material. And to me, that seems a more secure approach. Because the district court, the one that heard the case, made that finding. Correct. And it's really only for impeachment evidence. And there are a lot of arguments that weave in and out that suggest it would not have made a difference. But we have a finding by the district court that it wouldn't have made a difference. Correct. So we would have to say that that was clearly erroneous. Correct. And I think that is a difficult call. That, to me, seems your stronger argument. Well, and I would submit that the record amply supports the district court's finding that the evidence was not material. Kazi's testimony regarding these transactions was fully corroborated by documentary evidence, by bank records, by the testimony of Jacob and Isaiah Kingston about how the money moved. And thus his credibility, because of this corroboration, his credibility was less crucial to the government. In addition, he was thoroughly impeached with his recantation of his grand jury testimony, the fact that he had favorably settled a $135 million civil tax matter with the IRS shortly before trial, and the fact that he still owed $8 million on this loan that occurred, this $11.2 million loan, and had ceased making payments. So all of that fully supports the district court's finding that this would have been cumulative impeachment material that would not have created a reasonable probability of a different result. In terms of the relationship between L.A. Best and this investigation, what was the evidence that was the foundation for the district court's findings? And what I'm getting at, I still didn't really hear an answer to my question as to what was the predicate when, in the brief, the government asserts that it didn't know about the Garcia lawsuit until after it got the brief. Is there anything in the record beyond the statement that was in the appellate brief that would tell me that that, in fact, is the case? So the district court sort of assumed, but the only evidence showing that the government knew about these transactions was the allegation in the Kazi lawsuit that somebody who was either a law enforcement agent or was impersonating a law enforcement agent was involved in the fraud. And this was consistent with Garcia's practice of saying that he had connections, he defrauded the Kingstons in a similar scheme, saying that he had high-level connections who could stop the prosecution of the Kingstons. And so I would submit there's no credible evidence that the government did know. There's an allegation that a law enforcement agent was involved in these transactions that defrauded Kazi of $3 million based on these purchases of discounted, forfeited assets. But there's nothing showing that a government agent actually knew or was involved in these transactions. And the burden is on the defendant in this context, right, or is it not? I believe it is based on the district court's finding that there was no suppression. Was the L.A. best part of an official joint task force with the Utah prosecutors? Was there an official—when a federal and a state group cooperate, usually there's some document or some official thing that ties them together. No. Was there anything official about that in the L.A. best and Utah? No. So the L.A. best was a joint federal-state task force. But that joint federal was for prosecutions or possible prosecutions in L.A., isn't that right? Correct, and primarily involved Homeland Security agents. So that was why—and that agreement was between the state and federal people there in L.A. Correct. So when they said, well, we've got information now because there's a common defendant, Darman, that comes back and forth across L.A. to Utah, we'll give you some information. But was there any new solid agreement involving the prosecutors in Utah? There was no evidence of an agreement or of coordination between the tax prosecutors and the U.S. Attorney's Office in Utah and the L.A. best organization. We have some information. Well, so the letter that was sent to defendant pretrial by the government said, we are aware of other investigations that have been looking into the defendant, including— and there were a number of different investigations, and one of them was L.A. best. And it represented to the defendant, we have requested from these other investigations evidence that is relevant to this case. All evidence that was provided pursuant to that request was turned over to defense counsel. But there was no official joint task force? No. No, there's no evidence of a formal agreement between the two. I'm satisfied. Thank you. We ask the Court to affirm. I just want to stress that it's the juror's belief that Garagos represented Jackson that's critical here, not the question of whether he actually did or did not. And the security officer said that he overheard the jurors, as did Juror 16, talk about the fact that, in fact, Garagos did represent Michael Jackson. The government said that Juror 6 did not know this, but the court security officer specifically said that Jurors 6 and 3 said, quote, he is the one that got Jackson off. And that's at volume 27, pages 6700 to 6704 and 6706. And the government just alluded to the fact that in the instructions of the court, it specifically indicated that Garagos didn't represent any of the people listed on that sheet. I mean, what are we supposed to do with that? Aren't we supposed to presume that the jurors believe what the court said? Again, I think this is one of those circumstances, one of those unique cases where the prejudice arising from the jurors engaging in these discussions in a group.  You accepted the fact that Chathandra doesn't work. Well, then, what unique case can you point us to that is more like your case that would allow us to say this does fit into that box where instructions won't cut it? I think, again, I would look to this court's decision in Gonzales-Thomas that talked about implied bias because I think that's what we're talking about here. I also want to circle back briefly to this court's decision in Lawrence where the extraneous information was not something specifically about the facts of that case, but like this case, it was a pamphlet on jury nullification. So it had to do with the juror process and deliberations, and in that case, this court treated that pamphlet as extraneous information. I also just want to touch briefly, if I can. I see that I'm over. The judge found that Juror 6 was truthful and forthcoming, but I think the court has to look at the judge's contemporaneous remarks immediately after interviewing Juror 6 where the judge said Juror 6 was like a cat on a hot tin roof. She squirmed. She looked at the ground. She shifted. She mumbled and then went on to say that her body language was, quote, something to behold. It was the definition of a guilty conscience. So how does the judge immediately after interviewing Jury 6 and making those remarks, then turn around to support the order denying that anything happened that would invalidate this seven-and-a-half-week jury trial and say that Juror 6 was forthcoming and was truthful? Because the judge explicitly said that it relied upon certain assumptions that turned out to be wrong. Isn't that, in fact, what the court said on the record? Except that I believe that's true. Well, that tells us, gives us an explanation for why the court would make the findings it did, right? But there was nothing incorrect about the fact that Juror 6 was researching these cases and that the jurors were collectively talking about Garagos' representation of Jackson. If I can just touch on one other bit. I would just like the court to focus on the issue concerning the expert testimony here. Clearly, Washburn was a critical witness. He was the one they relied on to connect the financial transactions to the specified unlawful activities in Count 1. And he gave opinion testimony regarding commingling of funds, regarding cycling funds and tracing funds that was clearly expert based on his education as an attorney. And should not have been allowed to testify to those things. Why didn't you raise those in your direct first argument when the appellee would have had a chance to comment? We did. It was one of the main arguments. No, we're talking about here. Here, your oral argument. You are bringing up a brand new position that now the appellee doesn't have the chance to respond to. I understand, Your Honor. All I'm trying to do is point the court to that argument in our brief. I apologize for that and thank you for your time. Government, if you want 30 seconds to talk about the one argument regarding expert testimony alleged in Agent Washburn, have at it. I'll be brief, Your Honor. Agent Washburn's testimony was factual summary testimony. The district court admitted the summary exhibits which were provided to the defendant well in advance. And those summary exhibits showed the movement of money from the treasury checks that were issued to Washakie in response to the fraudulent tax credit claims and how that money moved through various bank accounts. The fact that that money, the treasury checks were proceeds was not really in dispute at trial. The question was how did the money move? And that was factual summary testimony that was consistent with this court's precedents upholding the use of summaries under Federal Rule of Evidence 1006. As long as no special expertise is required. Correct. I am a little troubled there. I mean, this was fairly sophisticated tracing that he was using. Well, I mean, his testimony on direct was that he had reviewed, you know, the records from these 55 different bank accounts and traced the movement of the money. And for many of the accounts, it was not particularly sophisticated tracing. It was just. No, for some of it wasn't, but it strikes me that some of it was. This Court contemplates that, you know, when there is voluminous evidence and Rule 1006 contemplates that there can be calculations involved. And Agent Washburn clearly explained how those summaries were compiled and was cross-examined at length about that. And finally, the evidence of money laundering was also overwhelming. So any error was harmless. Thank you, counsel. Thank you for your arguments, counsel. Case is submitted.